**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |  |
|---|---|---|
| **GARY SEITZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 3:08CV355** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on cross-motions for summary judgment.[1]  Plaintiff, Gary Seitz, seeks judicial

review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying

his application for Social Security Disability Benefits (DIB).  The Commissioner's final decision

is based on a finding by an Administrative Law Judge (ALJ) that Plaintiff was not disabled as

defined by the Social Security Act (the Act) and applicable regulations.

For the reasons discussed below, it is the Court's recommendation that Plaintiff's motion

for summary judgment (docket entry no.7) be DENIED; that Defendant's motion for summary

---

[1] The administrative record in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C).  In accordance with these rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to the extent necessary to properly analyze the case.

judgment (docket entry no. 8) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed for DIB on March 4, 2005, claiming disability due to grand mal seizures, severe headaches, paralysis in his right harm, chronic Hepatitis B and C, scoliosis, pinched nerves in his back, severe depression, memory problems and shortness of breath. (R. at 53-55, 87-88.)  Initially, Plaintiff alleged that the disability's onset date was October 1, 1988.  (R. at 53.)  The date was subsequently amended to October 1, 1995, as there was an adverse social security decision that had become final in September 1995.  (R. at 508.)  Additionally, the Claimant's records indicated that he had acquired sufficient coverage to remain insured only through September 30, 1996, and thus he was required to establish that he was disabled prior to, or on that date, in order to be entitled to a period of benefits.  (R. at 15, 507.)   The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 35-37, 46-48.)  Plaintiff requested a hearing and on March 14, 2007, accompanied by his wife who was to serve as a witness, Plaintiff appeared before an ALJ.  (R. at 488-504.)  Due to Claimant's production of several new medical records, and his desire to consider obtaining representation, the hearing was continued to a later date.  (R. at 502.)  On June 7, 2007 Plaintiff, again accompanied by his wife as well as counsel, testified before the ALJ.  (R. at 505-31.)  On June 25, 2007, the ALJ denied Plaintiff's application, finding that he was not disabled under the

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government–the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services–under arrangement with the SSA.  20 C.F.R. Part 404, Subpart Q; see also § 404.1503.  Hearings before Administrative Law Judges and subsequent proceedings are conducted by personnel of the federal SSA.

Act because he could perform his past relevant work as a short order cook and self-employed bathroom cleaner.  (R. at 22.)  The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.  (R. at 7-9.)

## II. QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits supported by substantial evidence on the record and the application of the correct legal standard?

## III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence.  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'"  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).  The

Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits.  20 C.F.R. §§ 416.920, 404.1520; Mastro, 270 F.3d at 177.  The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" (SGA).[3]  20 C.F.R. §§ 416.920(b), 404.1520(b).  If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition.  Id.  If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities.  20 C.F.R. § 404.1572(c).

activities." 20 C.F.R. § 416.920(c); see also 20 C.F.R.404.1520(c).  In order to qualify as a

severe impairment that entitles one to benefits under the Act, it must cause more than a minimal

effect on one's ability to function.  20 C.F.R. § 404.1520(c).  At the third step, if the claimant has

an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result

in death, it constitutes a qualifying impairment and the analysis ends.  20 C.F.R. §§ 416.920(d),

404.1520(d).  If the impairment does not meet or equal a listed impairment, then the evaluation

proceeds to the fourth step in which the ALJ is required to determine whether the claimant can

return to his past relevant work[4] based on an assessment of the claimant's residual functional

capacity (RFC)[5] and the "physical and mental demands of work [the claimant] has done in the

past."  20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will

not be awarded.  Id.  However, if the claimant cannot perform his past work, the burden shifts to

the Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience, and RFC, the claimant is capable of performing other work that is available in

significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v.

Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n.5

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  Id.  (footnote omitted).

(1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The Commissioner can carry his

burden in the final step with the testimony of a vocational expert ("VE").  When a VE is called

to testify, the ALJ's function is to pose hypothetical questions that accurately represent the

claimant's RFC based on all evidence on record and a fair description of all the claimant's

impairments so that the VE can offer testimony about any jobs existing in the national economy

that the claimant can perform.  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  Only when

the hypothetical posed represents *all* of the claimant's substantiated impairments will the

testimony of the VE be "relevant or helpful."  Id.  If the ALJ finds that the claimant is not

capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.

20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## IV.  ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset

of his disability.  (R. at 17.)  At steps two and three, the ALJ found that Plaintiff had the severe

impairments of a seizure disorder and a right upper extremity hemiparesis secondary to a head

injury, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404,

Subpart P, Appendix 1, as required for the award of benefits at that stage.  (R. at 17-19.)  The

ALJ next determined that through the date last insured, Plaintiff had the RFC to "perform light to

medium exertion", including sitting up to six hours in an eight hour workday, standing and

walking up to six hours in an eight hour workday, and lifting weights of up to fifteen pounds

frequently and forty pounds occasionally.  (R. at 19.)  Nonexertionally, the ALJ determined that

Plaintiff could not perform "rapidly repetitive manual tasks with his right, non-dominant upper

extremity" and that as a precaution, he should "avoid exposure to possible bodily injury from

hazards such as heights and machinery."  (R. at 19.)

The ALJ then determined at step four of the analysis that Plaintiff could perform his past relevant work as a short-order cook and self-employed bathroom cleaner because such work "did not require the performance of work-related activities precluded by his residual functional capacity."  (R. at 22.)  Because the ALJ determined that Plaintiff was capable of performing his past relevant work, it was unnecessary to pursue the analysis to step five in which the Commissioner would have had the burden to show that, considering the claimant's age, education, work experience, and RFC, the claimant was capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that he was not entitled to benefits.  (R. at 22.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings.  (Pl.'s Mot. for Summ. J.)  In support of his position, Plaintiff argues that: (1) the ALJ improperly utilized an unsuccessful work attempt as past relevant work for the purposes of making an adverse past relevant work determination; (2) the ALJ had no evidentiary foundation for the proposition that Plaintiff's mental impairment was non-severe; and (3) that there was no medical support for the ALJ's Physical RFC assessment. (Pl.'s Mem. in Supp. of Mot. for Summ. J. "Pl.'s Mem." at 5-8.)  Defendant argues that the Commissioner's final decision is supported by substantial evidence and should therefore be affirmed.  (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof "Def.'s Mem." at 1.)

1.      **The ALJ properly analyzed Plaintiff's past relevant work for the purposes of making an adverse past relevant work determination.**

Plaintiff contends that the ALJ improperly analyzed his past unsuccessful work attempts as past relevant work on which he based his adverse past relevant work determination.  (Pl.'s Mem. at 5-6.)  Specifically, Plaintiff argues that his work as a short order cook at a fast food restaurant and self-employed bathroom cleaner were unsuccessful work attempts, and thus could not be used as the basis for concluding that Plaintiff could perform those jobs as "past relevant work."  (Pl.'s Mem. at 5.)

At step four of the sequential analysis, the ALJ must determine whether the claimant is capable of performing any past relevant work that constitutes SGA.  20 C.F.R. § § 404.1520(e)-(f), 404.1560(b)(1).  SGA is defined under the Act as work activity that involves doing significant physical or mental activities which are typically done for pay or profit, regardless of whether a profit is realized.  20 C.F.R. § § 404.1572(a)-(b).  Whether past work constituted SGA is generally based on a determination of what earnings the claimant received for the tasks he performed during his employment.  See 20 C.F.R. § 404.1574(a)(2).  For positions in which the claimant was an employee, the Social Security Administration has established an earnings chart establishing when certain amounts of earnings, depending on the year in which they were earned, will ordinarily be regarded as indicative of SGA.  See 20 C.F.R. § 404.1574(b).  For example, monthly income earned between January 1990 and June 1999 that averaged more than $500.00 a month, would ordinarily demonstrate that the claimant was engaged in SGA. See 20 C.F.R. § 404.1574(b)(2)(Table 1).  For those claimants who were self-employed, an ALJ will consider the claimant's activities and their value to the claimant's business to determine whether they have engaged in SGA.  See 20 C.F.R. § 404.1575(a).

In conducting the SGA analysis, the Social Security Administration has stated that certain work attempts, which are classified as "unsuccessful work attempts", will not be considered as SGA for purposes of the step four analysis.  See 20 C.F.R. § 404.1574(c)(1); see also Noyd v. Barnhart, Case No. 01C15, 2002 WL 1559708, at *15 (N.D.Ill. July 12, 2002). Past work is classified as an unsuccessful work attempt when the "claimant is unable to perform work for more than a short time and is forced to quit the work due to an impairment."  Barina v. Shalala, 35 F.3d 555, 1994 WL 477783, at * 3 (4th Cir. Sept. 6, 1994).  More specifically, a claimant's past employment will not be considered substantial gainful activity if, after working for a period of six months or less, the claimant's impairment forced him to stop working or the claimant was compelled to reduce the amount of work that he did so that his earnings from such work fall below the those which the Social Security Administration have determined constitute SGA earnings.  20 C.F.R. § 404.1574(c)(1); Social Security Ruling 05-02, 70 FR 9692-03, at 9693 (Feb. 28, 2005) (hereinafter SSR 05-02).

The unsuccessful work attempt analysis also takes into account the length of time a claimant was employed in a particular position.  See 20 C.F.R. § 404.1574(c)(3)-(5); SSR 05-02, at 9693-94.  If the claimant's work effort lasted three months or less, the claimant must show that the work ended or was reduced to the non-SGA level due to his impairment, or to the removal of special conditions related to his impairment that were essential for claimant's performance of the work.  See 20 C.F.R. § 404.1574(c)(3).  If the work attempt lasted more than three months, the claimant must show that his work ended or was reduced to the non-SGA level within six months due to the his impairment, or to the removal of special conditions related to the impairment that were essential for the claimant's further performance of the work.  See 20 C.F.R. § 404.1574(c)(4).  Lastly, if the claimant's sustained SGA level work for more than six months, it

cannot be considered an unsuccessful work attempt regardless of why it ended or was reduced to the non-SGA level.  See 20 C.F.R. § 404.1574(c)(5).  In each of these circumstances, the Plaintiff has the burden of establishing that his previous work qualifies as an unsuccessful work attempt pursuant to the Social Security Regulations.  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993); Scott v. Commissioner of Social Security, 899 F. Supp. 275, 277 (S.D.W.Va. 1995).

      a.       Plaintiff's Work as a Short Order Cook

Plaintiff's asserts that the ALJ erred in utilizing Plaintiff's past unsuccessful work attempt as a short order cook at a McDonald's franchise operation as a basis for making an adverse past relevant work determination.  (Pl.'s Mem. at 5.)  In support of his argument, Plaintiff first asserts that his total earnings of $2058.71 do not represent earnings at an SGA-level, and thus such work cannot be used for a step four past work determination.  (Pl.'s Mem. at 5.)  Secondly, Plaintiff argues that his employment was terminated because he could no longer withstand the heat of the grill area in the restaurant, and therefore the employment constituted no more than an unsuccessful work attempt. (Pl.'s Mem. at 5.)

A review of the Record demonstrates that the ALJ's determination was supported by the substantial weight of the evidence.  Plaintiff worked as a short order cook at the McDonald's for several months in 1990.  (R. at 56, 277.)  Although it is unclear from the Record exactly how long Plaintiff was employed there, his medical records indicate that he told a physician  that he had worked for approximately three to four months in the 1991time frame.  (R. at 277.)  Assuming Plaintiff worked at the location for a four month duration, Plaintiff earned, on average, $514.67 a month.  That average monthly amount places Plaintiff above the Social Security Regulations $500.00 per month average of the amount of earnings ordinarily considered SGA for the year 1991.  See 20 C.F.R. § 404.1574(b)(2)(Table 1).  Thus, in order to substantiate the

10

ALJ's determination that Plaintiff's work as a short order cook was past SGA, Plaintiff must establish that such work qualified as only an unsuccessful work attempt.

As previously noted, in determining whether a work effort lasting between three and six months constituted an unsuccessful work attempt, the Plaintiff must establish that the employment ended or was reduced to the non-SGA level within six months due to his impairment, or to the removal of special conditions related to the impairment, and the Plaintiff must establish:  (1) that he had frequent absences from his work due to the impairment; or (2) his work was unsatisfactory due to the impairment; or (3) his work was done during a period of temporary remission of the impairment; or (4) his work must have been performed under special conditions.  20 C.F.R. § 404.1574(c)(4); SSR 05-02, at 9694.  In this regard, Plaintiff has failed to make a showing that his employment with McDonald's terminated due to his impairment, and he failed to establish that any of the additional four factors pertained to this work experience.

In fact, there is little information in the Record provided by Plaintiff as to his work experience as a short order cook.  Plaintiff stated in his work history report that his work responsibilities at McDonald's included "flipping burgers" on the grill and washing dishes.[6]  (R. at 84.)  At the hearing before the ALJ, Plaintiff testified that he stopped working at McDonald's because "the heat in the kitchen was too hot for [him]" and that he was having seizures at work. (R. at 518.)  When the ALJ questioned the VE as to whether any hazards existed for the position of a short order cook, the VE noted that cooking would require a person to be exposed to a hot grill.  (R. at 529.)  Plaintiff's counsel did not pursue that line of questioning, and no other evidence was submitted by Plaintiff concerning his employment as a short order cook.

---

[6] Plaintiff noted on his Work History Report that while he was at McDonald's, he would often break a lot of dishes.  (R. at 84.)  However, when Plaintiff testified before the ALJ, he recanted the statement, stating he had been confused about the form, and that he had only broken dishes at home.  (R. at 515.)

Although Plaintiff testified that he had experienced seizures at work, and that he had to leave because the kitchen was too hot for him, he did not present any evidence establishing that his impairments were the reason he terminated his employment.  Assuming, *arguendo*, that Plaintiff's testimony that he had to terminate his employment due to heat exposure was enough to demonstrate that he had left his position because of his impairment, Plaintiff failed to present any evidence showing that one of the four additional factors required under 20 C.F.R. § 404.1574(c)(4) existed at that time.  More specifically, Plaintiff did not present any evidence that he had frequent absences from work due to his impairment, nor did he establish that his work was unsatisfactory due to his impairment. <u>See</u> 20 C.F.R. § 404.1574(c)(4)(i)-(ii).  While Plaintiff stated that he had seizures while he was working at McDonald's, he remained employed in that position for three to four months, and he did not present any evidence that his performance was affected by the impairment.  (R. at 277, 518.)  Additionally, Plaintiff did not present evidence that he had worked during a period of temporary remission of his seizure disorder; nor did he establish that he worked under special conditions that were essential to his performance as a short order cook.  <u>See</u> 20 C.F.R. § 404.1574(c)(4)(iii)-(iv).  Therefore, Plaintiff's argument that his past relevant work as a short order cook did not constitute SGA fails.

b.      <u>Plaintiff's Work as a Self-Employed Bathroom Cleaner</u>

Plaintiff's further argues that his work as a self-employed bathroom cleaner should not have been considered as past SGA for which an adverse relevant work determination was also reached.  (Pl's Mem. at 5.)  However, Plaintiff does not assert specific facts supporting the argument, except to argue that he made less money in the position then when he worked as a short order cook, and that he had submitted letters from two potential employers who stated they

could not hire or accommodate his impairment(s) because of his impairment(s). (Pl.'s Mem. at 5.)

In considering whether a claimant who was formally self-employed was engaged in SGA during that time period, an ALJ must consider the claimant's activities and their value to the business in which the claimant was engaged. See 20 C.F.R. § 404.1575(a). With self-employed claimants, an ALJ will not consider income alone as the basis for determining whether the work constituted SGA, as the amount of income actually received by the claimant may depend on a number of different factors, including capital investments and profit-sharing agreements. See id. As with work by an employee, determining whether a self-employed claimant's work activities constitute an unsuccessful work attempt is based on the length of time that the claimant engaged in the work as well as the reasons the work was terminated. See id. As noted earlier, the claimant has the burden of proving that such work was not SGA pursuant to the Act. See Hunter, 993 F.2d at 35.

After a thorough review of the Record, it is clear that Plaintiff failed to present any evidence supporting his contention that his work as a self-employed bathroom cleaner was not SGA. The Record does not state how long Plaintiff worked as a self-employed bathroom cleaner, and there is no indication whether the $791.00 earned while self-employed and the $944.75 earned with Action Cleaning Services was all earned at one time, or over a span of time. (R. at 57.) Additionally, Plaintiff presented little information about his role or responsibilities as part of the cleaning venture. Plaintiff did testify at the hearing before the ALJ that the business license that he obtained was in his and his wife's name, but that she performed most of the actual work. (R. at 515.) However, no objection or argument was made at the hearing when the ALJ inquired as to Plaintiff's past janitorial work; nor was any argument raised about such previous

work constituting SGA while the ALJ questioned the VE about the activity.  (R. at 515, 529.)

Plaintiff also failed to testify or provide any documentation that the reason he terminated his

employment in that area was due to his impairments.  Although Plaintiff provided two letters

from other businesses stating that they could not accommodate his  disability, those employment

opportunities were not related to his self-employment and do not provide an explanation of why

he terminated his janitorial position in 1991.  (R. at 96-97.)

Plaintiff has the burden of proving that his past work did not constitute SGA, or

alternatively, that it constituted an unsuccessful work attempt under the Act, and he failed to

present any evidence at the hearing or otherwise in the Record as to why the ALJ should not

have considered his self-employment as a bathroom cleaner at step-four of his analysis.

Accordingly, the Plaintiff's argument that he had not engaged in SGA in his self-employment

activity also fails.

**2.      There is a sufficient evidentiary foundation for the proposition that Plaintiff's
          mental impairment was non-severe as found by the ALJ.**

Plaintiff also contends that the ALJ's finding that Plaintiff's mental impairment was non-

severe is not supported by the substantial weight of the evidence, as required.  (Pl.'s Mem. at 6.)

Specifically, Plaintiff argues that the State Agency psychologists who reviewed Plaintiff's file

did not have all of the pertinent documents at the time of their review.  (Pl.'s Mem. at 6.)

Additionally, Plaintiff asserts that his I.Q. score during the time frame at issue was in the 70's

and that such an intelligence score provides prima facie evidence of a severe mental impairment.

(Pl.'s Mem. at 6-7.)

When evaluating a claimant's alleged mental impairment, the ALJ will first evaluate the

claimant's "pertinent symptoms, signs, and laboratory findings" to determine if the claimant has

a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  If the ALJ

determines that a medically determinable mental impairment exists, then the ALJ must rate the

degree of functional limitations which results from the impairment.  See 20 C.F.R. §

404.1520(b)(2).  The SSA has identified four broad functional areas in which an ALJ will rate

the degree of a claimant's functional limitations, namely: (1) activities of daily living[7]; (2) social

functioning[8]; (3) concentration, persistence and pace[9]; and (4) episodes of decompensation[10]. 20

C.F.R. § 404.1520a(c)(3).  In rating the first three functional areas, an ALJ will utilize a five

point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4).  When

evaluating the fourth functional area, the ALJ utilizes a four point scale: none, one or two, three,

four or more.  Id.  After rating each degree of functional impairment, the ALJ must determine the

severity of the claimant's mental impairment by analyzing the ratings given to the various

---

[7]  Activities of daily living include activities such as "cleaning, shopping cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using  telephones and directories, and using a post office."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C1. The ALJ will assess the quality of these activities by their "independence, appropriateness, effectiveness, and sustainability.  Id.  Additionally, the ALJ will determine the extent to which the claimant is able to initiate and participate in these activities independently.  Id.

[8]  Social functioning refers to a claimants capacity to interact independently, appropriately, effectively and on a sustained basis with other individuals. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C2.  It can include a claimants ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  Id.

[9]  Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C3.

[10]  Episodes of decompensation are exacerbation or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C4.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two.)  Id.  Episodes of decompensation may be inferred from medical records showing significant alteration in medication or documentation of the need for a more structured psychological support system.  Id.

functional areas.  See 20 C.F.R. § 404.1520a(d).  If the ALJ rates the degree of limitation in the first three functional areas as mild or none, and gives a rating of none in the fourth area, then the ALJ will generally conclude that the claimant's impairments are non-severe, unless the evidence indicates that there is more than a minimal limitation on the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520a(d)(1).  If the ALJ determines that a claimant's impairment is severe, he will then determine if the impairment meets or equals the severity of one of the listed mental disorders found in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.  See 20 C.F.R. § 404.1520a(d)(2).  If the severe impairment does not meet or equal in severity any listing, then the ALJ will assess the claimant's RFC in light of the mental impairment and in conjunction with all other severe impairments.  See 20 C.F.R. § 404.1520a(d)(3), § 404.1523.

Here, the ALJ concluded that Plaintiff's psychiatric impairments had "no more than a minimal effect on his ability to function and were 'not severe' from the [Plaintiff's] amended alleged onset of disability through his date last insured."  (R. at 18.)  In support of his conclusion, the ALJ explained that Plaintiff had undergone several psychological evaluations in the time frame leading up to alleged disability period which produced diagnoses such as "atypical organic dysfunction," major depression, an "organic personality syndrome," and a post-traumatic stress disorder; however, the ALJ noted that the Plaintiff's global assessment of functioning after each evaluation was 60 ("reflective of the mildest range of moderate symptoms and limitations according to the Diagnostic and Statistical Manual of Mental Disorders 4th Edition").  (R. at 18.)  Additionally, the ALJ explained that several psychological tests revealed only "mild problems with information processing, visual memory deficits and verbal memory deficits, and average intellectual functioning."  (R. at 18.)  The ALJ further noted that Plaintiff did not undergo any mental health care before or during his alleged disability period, and that a

psychological evaluation in April 1995 concluded that Plaintiff was mentally competent and capable of handling his financial affairs.  (R. at 18.)  Therefore, the ALJ concluded that there were no reports of "restricted activities of daily living, impaired social functioning, or more than mild difficulties with concentration, persistence or pace related to psychiatric symptoms on or before his date last insured."  (R. at 18.)

A review of the Record demonstrates that the ALJ's assessment that Plaintiff's psychological impairments were non-severe is supported by the substantial weight of the evidence.  In 1992, Plaintiff underwent a psychological evaluation in conjunction with his application for service-connected disability from the Bureau of Veterans' Affairs.  (R. at 398.) At that time, Plaintiff had not received any prior mental health treatment.  (R. at 399.)  The examiner reported that Plaintiff's Verbal I.Q. was 88, and his Performance I.Q. 76, with a Full Scale I.Q. of 80.  (R. at 401.)  Regarding Plaintiff's mental impairments, the examiner concluded that Plaintiff exhibited atypical organic dysfunction and major depression, with no personally disorder and an adaptive functioning level of 60.  (R. at 403.)  Specifically, the examiner stated that Plaintiff suffered from "moderate limitations to selected aspects of information processing" and that he had "moderate-severe emotional problems most accurately characterized as major depression."  (R. at 404.)  However, the examiner also noted that rehabilitation was possible, but that the symptoms were likely to persist for at least twelve months "depending upon the course of rehabilitation and situational factors such as employment and his ability to fulfill his obligations as the principle source of income for the family."  (R. at 404.)

In January 1993, the Plaintiff underwent another evaluation in which a number of psychological tests were administered.  (R. at 409.)  The examiner reported that Plaintiff's overall intellectual abilities were in the average range, and that plaintiff had obtained a Shipley

17

WAIS-R equivalent Full Scale IQ of 93, which placed Plaintiff in the 32nd percentile of the general population.  (R. at 410.)  The examiner did find that there were indications of neuropsychological dysfunction in the mild to moderate range, but that the examiner could not precisely determine the possible presence, extent, locus or nature of any specific deficits.  (R. at 410.)  Additionally, the examiner tested Plaintiff's neuropsychological functions, and found that Plaintiff demonstrated normal alertness and orientation; that Plaintiff's ability to attend and concentrate were within normal limits; and that Plaintiff's memory functioning indicated mild impairment for visual stimuli and moderate impairment for verbal information.  (R. at 410-11.)  The examiner concluded that Plaintiff's neuropsychological functioning fell within the range of scores associated with mild to moderate impaired brain functioning, and that Plaintiff suffered from "some depression" that also interfered with his cognitive efficiency.  (R. at 412.)

Plaintiff's last evaluation before the alleged onset of his alleged disability period was an addendum to his 1993 psychological evaluation conducted in April 1995.  (R. at 475.)  In the examiner's mental status examination, she noted that Plaintiff's thought processes were goal directed and linear, his thought content was without any delusions or hallucinations, and that he denied any suicidal or homicidal ideation.  (R. at 476.) As to her cognitive examination, the examiner wrote that Plaintiff was unable to recall three words after five minutes, but that he was able to repeat them immediately.  (R. at 476.)  The examiner also stated that Plaintiff's concentration was intact and that his judgment and insight were fair.  (R. at 476.)  The examiner further noted that Plaintiff endorsed ongoing depressive and post traumatic stress symptomology, but that he had received no psychiatric follow-up and was not taking any psychiatric medications.  (R. at 476.)  The examiner concluded that Plaintiff had mild major depressive

disorder with post traumatic stress disorder, but that Plaintiff was still mentally competent and that he could manage his own affairs.  (R. at 477.)

Given the psychological examination results, the ALJ did not err in finding Plaintiff's alleged psychological impairments to be non-severe.  As the ALJ explained, none of Plaintiff's psychological evaluations indicated that Plaintiff's daily living activities were affected by his impairments.  Indeed, Plaintiff himself stated during the 1992 evaluation that although he had trouble with grasping, he was still able to take care of his own personal needs such as bathing and grooming, and he could perform light housework.  (R. at 400.)  Additionally, there is little evidence that Plaintiff's social functioning was impaired by his alleged psychological impairment.  During the 1995 evaluation, the examiner noted that Plaintiff's eye contact was good and that his thoughts were focused and linear.  (R. at 476.)  Even in a psychological examination conducted in 2005, substantially after Plaintiff's alleged disability onset period, Plaintiff was found to have good social judgment and fair insight. (R. at 278.)  Similarly, Plaintiff's concentration, persistence and pace were consistently reported as being in tact.  During the 1993 evaluation, the examiner noted that Plaintiff had a full range of affect and that his thought processes were linear and goal directed.  (R. at 415.)  The examiner also stated that Plaintiff's memory and cognition were grossly in tact and that his insight was fair and his judgment adequate.  (R. at 415.)  Again in 1995, the examiner found Plaintiff's concentration to be intact with his judgment and insight classified as fair.  (R. at 476.)  Given such information, it was reasonable for the ALJ to classify Plaintiff's degree of limitation in the first three functional areas as "none" or "mild."

As to Plaintiff's episodes of decompensation, it was not improper for the ALJ to determine that none existed based on the evidence presented.  As argued by the Defendant, Plaintiff presented no evidence of any episodes of decompensation.  Specifically, outside of the psychological examinations administered for retirement and disability purposes, Plaintiff did not seek psychiatric treatment, and was not placed on anti-psychotic medications until well after his insured status expired.[11]  (R. at 528.)  Although it is noted that Plaintiff reported an attempted suicide in early 1995, Plaintiff stated afterwards that he only had vague suicidal ideation at times.  (R. at 475.)  Despite those thoughts, the examiner who examined Plaintiff the same year as the reported incident concluded that Plaintiff only suffered  mild major depressive disorder and post traumatic stress disorder. (R. at 477.)  Additionally, there is no evidence that Plaintiff sought psychiatric treatment after the incident occurred.  Furthermore, as to episodes of decompensation, the state medical examiner concluded, after a review of Plaintiff's records, that there was insufficient evidence to determine whether any episodes of decompensation existed as there was no evidence in the record that Plaintiff suffered a cognitive deficit prior to the date last insured, and that no medical records existed from September 1995 through September 1996 indicating that a mental impairment or mental diagnosis had been made.  (R. at 297.)  Therefore, the ALJ's determination that Plaintiff's mental impairments were non-severe is supported by the substantial weight of the evidence presented.

Finally, in regard to the classification of Plaintiff's mental issues, Plaintiff asserts that his I.Q. score presented in the 70's which is prima facie evidence of a severe mental impairment

---

[11]  Additionally, as noted by the Defendant, although the Record is not entirely clear, it appears that the anti-psychotic medications that were administered to Plaintiff related to his hepatitis c diagnosis and were not prescribed to only address psychological impairments.  (R. at 528.)

pursuant to Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983).  (Pl.'s Mem. at 6.)  The Social Security Regulations state that a severe impairment is one which significantly limits a persons physical or mental ability to perform basic work activities.  See 20 C.F.R. § 404.1520(c); § 404.1521(a).  Such basic work activities can include physical functions such as walking, standing or sitting, the ability to see, hear or speak, the ability to understand, carry out and remember simple instructions, the use of judgment, the ability to respond appropriately in work settings, and the ability to deal with changes in a routine work setting.  See 20 C.F.R. § 404.1521(b)(1)-(6).  In determining whether a claimant has a severe mental impairment which hinders a claimant's ability to perform basic work activities, the Regulations provide that standardized intelligence test results may help verify the presence of a severe mental impairment, or they may demonstrate the extent of any compromise in cognitive functioning, but that such test results are only one factor in the overall assessment and must be considered in light of the narrative reports that accompany the test results.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § D.6.  Thus, when an ALJ is considering whether a claimant has a severe mental impairment which does not meet any of the Listed Impairments in Appendix One,[12] he must consider the claimant's I.Q. scores in the context of all other credible medical evidence presented.

A review of Plaintiff's I.Q. score results, and the accompanying narratives presented by the examining doctors, demonstrate that the ALJ did not err in determining that Plaintiff's mental impairments were non-severe.  Plaintiff presented results from three separate I.Q. tests.

---

[12]  Based on Plaintiff's Memorandum in Support of his Motion for Summary Judgment, it does not appear that he is attempting to establish that he meets one of the Listed Impairments in Appendix One of the Regulations, and thus such an argument will not be discussed at length in the Report and Recommendation. However, the Court notes that Plaintiff's I.Q. scores alone do not qualify him as having a listed impairment pursuant to either 12.02 or 12.05.  Accordingly, such an argument would be without merit in any event.

Plaintiff's I.Q. was first tested in October 1992, and the examiner reported Plaintiff's Verbal I.Q. at 88, his Performance I.Q. at 76 and his Full Scale I.Q. at 80.  (R. at 401.)  The examiner noted that Plaintiff's Full Scale I.Q. fell at the lowest point in the low average range, but that the scores were "not considered representative of the subject's life-long capability when compared to prior educational and occupational landmarks."  (R. at 401.)  The examiner concluded that Plaintiff's reduction in intellectual functioning was related to his inability to store new information and retrieval of encyclopedic information as well as abstract sequential analysis.  (R. at 402.)  However, the examiner also concluded that Plaintiff's paired associate learning, logical memory and mental control were within the average limits, and that Plaintiff's ability to copy, retrieve simple over learned material, simple calculations, judgment and reasoning, as well as short-term storage and retrieval of simple information, were all within normal limits.  (R. at 402.)

Plaintiff's I.Q. was again tested in early 1993, when the examiner reported Plaintiff's Full Scale I.Q. as 93, which the examiner reported did "not appear to be significantly below what would be expected, based on his work and vocational history."  (R. at 410.)  In his report, the examiner also extensively examined Plaintiff's neuropsychological functions, concluding that Plaintiff demonstrated "normal mental alertness and cortical arousal and was oriented to person, time and place" and additionally noted that Plaintiff's ability to "attend and concentrate were all with in normal limits."  (R. at 410.)  Furthermore, the examiner found that although Plaintiff's memory functioning was characterized by mild impairment for visual stimuli and moderate impairment for verbal information, Plaintiff's learning curve reflected only "a mild problem for learning and retaining verbal information after multiple trials."  (R. at 411.)

Plaintiff's last reported I.Q. test, the one which Plaintiff primarily relies on, occurred in 2005, approximately eight years after the disability onset period at issue in this case.  (R. at 274-83.)  Although Plaintiff asserts that his I.Q. was in the 70's, the examiner reported, in fact, that Plaintiff's Full Scale I.Q. at 82, with his Verbal I.Q. at 87 and his Performance I.Q. at 79.  (R. at 278..)  In the course of his examination, the examiner noted that Plaintiff's speech was "appropriate, logical and coherent," and that there was "no apparent evidence of a formal thought disorder."  (R. at 278.)  Additionally, despite trouble with his memory, the examiner noted that Plaintiff's attention and concentration were fairly good, his intellectual functioning level was estimated to be in the low average range, and that Plaintiff's social judgment was good with his insight described as fair.  (R. at 278.)

Given the results of Plaintiff's I.Q. examinations, as well as the accompanying narratives submitted by the examining physicians, it is clear that Plaintiff's I.Q. scores are not, alone, prima facie evidence that Plaintiff's mental impairment was severe in the relevant time period.  In testing the Plaintiff's I.Q., at a point in time closest to the relevant period, it is not demonstrated that Plaintiff was incapable of engaging in work activity as defined in 20 C.F.R. § 404.1521(b)(1)-(6).  Indeed, both the 1992 and 1993 reports support the ALJ's analysis that Plaintiff's mental impairment did not significantly limit the Plaintiff's ability to do basic work activities, as both examiners concluded that Plaintiff was attentive, oriented and able to concentrate and exercise appropriate judgment.  Furthermore, even Plaintiff's most recent examination, despite being significantly removed in time from the alleged disability period, indicates that despite a lower I.Q. score then that reported in 1993, Plaintiff had fair insight, good social judgment and that Plaintiff's speech was appropriate, logical, and coherent with him being

23

able to attend and concentrate fairly well.  Reviewing the cumulative scores and their attending comments, the ALJ's finding that Plaintiff's mental impairment was not severe is supported by the substantial weight of the evidence.

**3.      The ALJ had sufficient medical support for his physical residual functional capacity assessment.**

Finally, Plaintiff asserts that there is no medical support for the ALJ's residual functioning capacity assessment (RFC) regarding Plaintiff's physical impairments. (Pl.'s Mem. at 7.) Specifically, Plaintiff asserts that the ALJ erred in relying almost entirely on an evaluation by a physical therapist in making the RFC determination and that the ALJ improperly characterized Plaintiff's RFC when posing hypotheticals to the VE.  (Pl.'s Mem. at 7-8.)

At step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work, the ALJ must determine the claimant's RFC.  20 C.F.R. § § 404.1520(e)-(f), 404.1545(a)(5)(i). In looking specifically at a claimant's physical abilities, the ALJ will first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis.  See 20 C.F.R. § 404.1545(b).  Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including arranging for consultive examinations if necessary.  See 20 C.F.R. § 404.1545(a)(3).   The ALJ's RFC determination must incorporate impairments supported by the objective medical evidence in the record and those based on the claimant's credible complaints.  See 20 C.F.R. § 404.1545(a)(3).

Here, the ALJ determined that Plaintiff had the RFC to perform work at light and medium exertion levels.  (R. at 19.)  Specifically, the ALJ found that Plaintiff could sit up to six hours in an eight hour work day, as well as stand and walk up to six hours in an eight hour workday and lift weights of up to fifteen pounds frequently and forty pounds occasionally.  (R. at 19.) Nonexertionally, the ALJ concluded that the Plaintiff could not perform rapidly repetitive manual tasks with his right, non-dominant upper extremity, and as a precaution would have to avoid exposure to possible bodily injury from hazards such as heights and machinery.  (R. at 19.)

In reaching his conclusions, the ALJ conducted a thorough review of the medical records during the time period relevant to Plaintiff's disability claim.  (R. at 20-22.)  The ALJ first considered Plaintiff's hearing testimony, in which he stated that he had undergone physical therapy for his right upper extremity weakness and dexterity problems, but that there had been little change in his functional ability. (R. at 20.)   The ALJ also considered Plaintiff's testimony that he had limited sensation in his right hand, and would not be able to pick up a gallon of milk with that hand, but the ALJ also noted that Plaintiff was able to tie his shoes with both hands.  (R. at 20.)  The ALJ also considered the history of Plaintiff's impairment, explaining that it was attributed to a head injury Plaintiff suffered in 1989 when Plaintiff experienced mild right hemiparesis.  (R. at 20.)  The ALJ noted that as of October 1989, the Plaintiff had 4/5 strength in his right extremity and in October 1993, Plaintiff's right extremity had two-finger pinch with Plaintiff being able to use it to assist with his activities of daily living.  (R. at 20.)  Even beyond the applicable disability period at issue, the ALJ noted that as of June 1997, Plaintiff's right extremity still had 4/5 strength, even though there was flexion deformity of the joints of the small finger.  (R. At 20-21.)  The ALJ also took note of an October 1992 functional capacity evaluation

in which claimant was found able to perform light to medium exertion, including lifting up to

forty pounds occasionally and fifteen pounds frequently, with only slow movement in his right

upper extremity and difficulty manipulating small instruments.  (R. at 21.)

A review of the Record demonstrates that the ALJ's physical RFC analysis was thorough

and that it was supported by the substantial weight of the evidence.  Throughout the time period

leading up to and following the relevant disability period, Plaintiff's strength in his right

extremity remained consistent.  In April 1990, the year after his head injury, Plaintiff exhibited

4+/5 motor strength in his right hand grip, with some functional component.  (R. at 382.)  In July

of 1992, a social services examination revealed that Plaintiff's right arm had 4/5 muscle strength

in the biceps and triceps with 4-/5 strength noted in his wrists, dorsiflexors, and in the intrinsic

muscles in Plaintiff's hand.  (R. at 395.)  While the examiner also noted that there was muscular

atrophy in regard to the intrinsic muscles of Plaintiff's hand and forearm, he nevertheless opined

that Plaintiff was "otherwise able to maintain his job despite his right arm weakness."  (R. at 396.)

Furthermore, the examiner stated that Plaintiff's condition was stable, "without any significant

change since the last evaluation two years previously."  (R. at 396.)

In October 1992, another functional assessment was conducted in which it was noted that

Plaintiff "demonstrated high abilities in standing, walking activities, and overhead reach with

[his] upper extremity." (R. at 98.)  The examiner concluded that Plaintiff could function at the

light-medium physical demand, with an ability to lift forty pounds occasionally and fifteen

pounds frequently throughout the day.  (R. at 98.)  The examiner also noted that Plaintiff should

have had a fair rehabilitation potential.  (R. at 98.)  The examiner concluded that "even though his

physical disabilities will prevent him from performing physical [*sic*] demanding occupations, it

should not be a handicap or an impediment for future employment, once he can achieve skills

necessary to meet an adequate career choice." (R. at 106.) In August 1993, Plaintiff's arm

strength was examined, with right arm strength of 4+/5 in his deltoids, triceps and biceps and 4-/5

strength throughout his wrist, grip and hand intrensics. (R. at 131.) As of 1997, shortly after the

alleged disability period ended, Plaintiff continued to have motor exam results of 5/5/ except for

"right-sided weakness, right upper extremity proximally 4+/5, distally 3+/5, right lower extremity

4+/5."

Contrary to the Plaintiff's argument, the ALJ's physical RFC analysis was not simply

based on the report of one physical therapist. Instead, the ALJ considered the consistency over

time of Plaintiff's right upper extremity strength, and he utilized the physical therapists functional

capacity assessment(s) (which was conducted relatively close to the alleged disability period) as a

base to make a well-supported RFC determination.

Given the RFC analysis, it is clear that the ALJ's questions to the VE were appropriate.

In questioning the VE, the ALJ attempted to determine whether Plaintiff, given his severe

impairments, would nevertheless be able to return to his previous work as either a short order

cook, or as a self-employed bathroom cleaner. (R. at 529-30.) The ALJ, consistent with the

Dictionary of Occupational Titles, asked the VE to characterize Plaintiff's past work to which

the VE responded that a short order cook would perform light semi-skilled work, and that a

bathroom cleaner could perform light unskilled work. (R. at 529.) The ALJ then questioned,

based on the RFC determination, whether those positions would require bilateral manual

dexterity to which the VE testified that both positions would. (R. at 529.) The ALJ, inquiring

not only in regard to Plaintiff's right extremity, but also relative to his seizure disorder,

27

questioned whether Plaintiff's past positions required rapidly repetitive manual tasks, to which the VE responded that they did not.  (R. at 529.)  Lastly, the ALJ questioned whether the past positions required exposure to hazards such as dangerous machinery or unprotected heights, and the VE responded that only the cooking task required exposure to a hot grill.  (R. at 529.)

The ALJ's inquiry of the VE, as a whole, took into account the different facets of Plaintiff's RFC to determine whether Plaintiff would be able to perform his previous employment.  As the ALJ's RFC determination was based on the substantial weight of the evidence, and the related inquiry regarding step four of the analysis appropriately addressed Plaintiff's impairments, it is the conclusion of this Court that the ALJ's findings were sufficiently supported by the evidence and arrived at by application of the correct legal standards.

## V.  CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (docket entry no. 7) be DENIED; that Defendant's motion for summary judgment (docket entry no. 8) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within ten (10) days after being served with a copy of this report may result in the waiver of any right to a**

**de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                    /s/

                                Dennis W. Dohnal
                                United States Magistrate Judge

Date: May 26, 2009
Richmond, Virginia